UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

HERBERT LEON MANAGO,

      Plaintiff,

v.                        Case No. 3:23-cv-151-MMH-MCR

BENJAMIN SMITH, et al.,

      Defendants.

_____

**ORDER**

**I. Status**

Plaintiff Herbert Leon Manago, an inmate of the Florida Department of Corrections (FDOC), initiated this action by filing a pro se Civil Rights Complaint (Doc. 1) under 42 U.S.C. § 1983. He is proceeding on an Amended Complaint (Doc. 10; AC). Manago names seven Defendants: (1) Captain Benjamin Smith; (2) Officer London Boone; (3) Major Jason Carter; (4) Sergeant Robert Nicholson, Jr.; (5) Sergeant Damon Bryant; (6) Sergeant Tyler Benson; and (7) Officer Kenderick Dewberry.[1] Id. at 2. He raises Eighth

_____

[1] The Court will direct the **Clerk** to correct the docket to reflect the correct spelling for Defendants "Nicholson" and "Dewberry" as shown in Defendants' Motion for Summary Judgment. See Doc. 39.

Amendment claims of excessive force and failure to intervene, as well as a Fourteenth Amendment due process violation.

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 39; Motion), with exhibits (Docs. 39-1 to 39-11). The Court advised Manago of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and permitted him to respond to the Motion. See Order (Doc. 11); Summary Judgment Notice (Doc. 40). Manago responded to the Motion (Docs. 44, 45, 46; collectively, Responses). Defendants filed a Reply (Doc. 47; Reply); and Manago filed an objection to the Reply (Doc. 48).[2] The Motion is ripe for review.

## II. Manago's Allegations[3]

Manago alleges that on September 8, 2022, Defendant Smith approached Manago's cell door and threatened to use chemical agents despite Manago's compliance with all FDOC rules of conduct. AC at 7. He asserts that a few hours later, Defendant Carter approached his cell and also threatened to use

---

[2] Manago's objection to the Reply was unauthorized, but the Court will consider it.

[3] For the purposes of resolving Defendants' Motion, the Court views all disputed facts and reasonable inferences in the light most favorable to Manago. However, the Court notes that these facts may differ from those that ultimately can be proved at trial. See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002).

chemical agents on Manago for no reason. Id. According to Manago, Carter then ordered Defendants Nicholson and Bryant to place Manago on property restriction. Id. Manago contends he complied with Nicholson and Bryant's requests for him to submit to restraints for the ordered property restriction. Id. Nicholson and Bryant then applied the wrist and leg restraints so tight that Manago's wrists and ankles were lacerated and bleeding. Id. They then removed all Manago's personal property from his cell, placed him back into the cell, removed the restraints, and left Manago with only his underwear. Id.

About four hours later, Defendants Carter, Smith, Boone, Benson, and Dewberry approached Manago's cell and "manipulated the use of force camera to make it appear that there was a need for force." Id. at 8. Manago asserts he was not creating a disturbance, but Smith still ordered Boone to spray chemical agents into Manago's cell, while the other Defendants failed to intervene in the use of excessive force. Id. at 8-9. About five minutes after Boone sprayed chemical agents into Manago's cell, Smith ordered Manago to submit to restraints so officers could escort him to the decontamination shower. Id. Manago complied with the orders, and while Dewberry and Benson applied the wrist and leg restraints, they also lacerated Manago's wrists and ankles, exacerbating his wounds and causing more bleeding. Id.

Manago contends he then took a decontamination shower before officials escorted him to medical for a post-use-of-force exam. Id. According to Manago,

he complained to medical staff about his injuries, but medical staff declined to provide any treatment. Id. Following the exam, officers escorted Manago back to his cell, which he contends was still contaminated with chemical agents. Id. He alleges Defendants then wrote false disciplinary reports against him to justify their conduct and use of force. Id. at 9.

Based on these allegations, Manago appears to set forth the following claims: (1) Defendants Nicholson and Bryant's application of leg and wrist restraints to place Manago on property restriction amounted to excessive force; (2) Defendant Boone's use of chemical agents, upon Defendant Smith's order, amounted to excessive force; (3) Defendants Carter, Benson, and Dewberry failed to intervene in Defendants Smith and Boone's use of excessive force; (4) Defendants Dewberry and Benson's application of hand and leg restraints for Manago's decontamination shower amounted to excessive force; and (5) Defendants' manipulation of the use-of-force handheld camera footage to justify the use of chemical agents violated his due process rights. See generally id. Manago asserts he suffered "extreme elevated blood pressure," skin rashes, temporary vision loss, and lacerations on his wrists and ankles as a result of Defendants' actions. Id. As relief, Manago seeks compensatory, nominal, and punitive damages. Id.

# III. <u>Summary Judgment Standard</u>

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).[4] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. <u>Mize v. Jefferson</u>

---

[4] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

<u>Id.</u> "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." <u>Campbell v. Shinseki</u>, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable.

In citing to <u>Campbell</u>, the Court notes that it does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. <u>See</u> <u>McNamara v. GEICO</u>, 30 F.4th 1055, 1060–61 (11th Cir. 2022); <u>see generally</u> Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Est. of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995)

(citing <u>Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro</u>, 38 F.3d 1571, 1578 (11th Cir. 1994)). "Summary judgment is improper, however, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Guevara v. NCL (Bahamas) Ltd.</u>, 920 F.3d 710, 720 (11th Cir. 2019) (quotation marks and citation omitted).

## IV. <u>Summary of the Parties' Positions</u>

### A. Defendants' Motion & Evidence

In their Motion, Defendants contend they are entitled to summary judgment on Manago's claims against them because they followed proper use-of-force procedures after Manago repeatedly refused to comply with orders to cease his disruptive behavior. Motion at 2-3. They assert that there is no record evidence supporting Manago's claims of excessive force, failure to intervene, or that Defendants "manipulated" reports or camera footage to justify the use of force. <u>Id.</u> at 2. They also argue they are entitled to qualified immunity; and they assert that Manago's allegations establish that Defendants' uses of force resulted in Manago suffering only <u>de</u> <u>minimis</u> injuries. <u>See</u> <u>id.</u> at 7-13.

In support of their positions, Defendants submitted a DVD containing two video recordings from a handheld camera.[5] The first handheld video

---

[5] The video evidence is on a single DVD that contains two videos: one video depicts events that occurred between 3:07 p.m. and 3:12 p.m. (Doc. 39-2), and one video depicts the events that occurred after 4:48 p.m. (Doc. 39-3).

recording (Doc. 39-2) begins at 3:07 p.m. with Officer Harper introducing himself as the handheld camera operator before Defendant Smith gives a lead-in statement explaining that Manago has been creating a disturbance on his wing and yelling obscenities at prison staff. Smith advises that he and a mental health official made several attempts to counsel Manago and get him to cease his disruptive behavior, but all attempts were unsuccessful. Smith states he obtained authorization from Warden Polk to use chemical agents on Manago should Manago refuse Smith's final order to comply and that medical staff confirmed that Manago's medical status would not prevent the use of chemical agents. Smith then walks to Manago's cell door and issues a final order for Manago to comply and stop his disruptive behavior. Smith further tells Manago that this final order would remain in effect for the remainder of his shift. While Smith gives his final warning, Manago briefly walks up to the cell door window, verbally confirms that he understands Smith's final order, and then retreats into his cell. Smith then walks away from Manago's cell after directing that the camera remain focused on Manago's cell door for about three minutes. After the three minutes pass, Smith reapproaches Manago's cell and announces that Manago is now in compliance with all orders, so no further action is needed at that time. Officer Harper states that the time is 3:12 p.m. and stops recording.

The second handheld video recording (Doc. 39-3) begins one-hour-and-thirty-six-minutes later, at 4:48 p.m., with Officer Harper again introducing himself as the handheld camera operator and Defendant Smith giving a lead-in statement. Smith briefly advises that Manago has resumed his disorderly behavior, yelling obscenities at staff and disturbing his housing unit. Smith explains that Defendant Boone will administer chemical agents into Manago's cell and Officer Harper will video the use of force. Smith, an officer carrying a spray can (likely Defendant Boone),[6] and a third officer then approach Manago's cell (cell # 1102). The camera is positioned a few feet away from the door, Manago is not within sight of the video recording, and no sounds are heard coming from Manago's cell. Without first communicating with Manago in any way, Defendant Smith slightly opens the cell door and Defendant Boone administers three, one-second bursts of chemical agents into Manago's cell. The video neither shows where Manago is located during the application, nor if any of the three, one-second bursts make direct contact with Manago's person. Defendants Smith and Boone then walk away. The camera lens becomes foggy, likely because of the application of chemical agents, but it

---

[6] Defendant Boone does not introduce himself on the video recording but since no party disputes that Defendant Boone was the individual who administered the chemical agents, the Court assumes the person on the video who administered the spray is Defendant Boone.

remains focused on Manago's cell door. Manago is seen occasionally approaching his cell door window and can be heard coughing.

About four minutes later, two officers (presumably Defendants Benson and Dewberry)[7] approach Manago's cell door. One of the officers opens the cell door flap and Manago immediately places his hands through the flap and permits the officer to apply hand restraints. No leg restraints are applied, and the other officer never places any other restraints on Manago. The officers then open Manago's cell door and calmly walk him out of his cell and escort him across the hall into the decontamination shower. Once inside the shower, officers close the door and Manago allows them to calmly remove his hand restraints before he begins to shower. The cameraman cleans the camera's lens, making the video's view clearer. During his shower, Manago appears to quietly dance and sing to himself. Although coughing is heard on the video, it is unclear if Manago is the person coughing or if it is someone else within the housing wing. Manago showers for three minutes and then an officer approaches the shower cell and hands Manago a towel. Manago dries off. Before submitting to hand restraints, Manago seems to address the camera for the first time and yells an obscene word, but he immediately ceases any

---

[7] Defendants Benson and Dewberry do not introduce themselves on the video, but because no party disputes that these two Defendants applied restraints to Manago to escort him to the decontamination shower, the Court assumes these individuals are Defendants Benson and Dewberry.

disruptive behavior after an officer tells him to stop. Manago then calmly puts on clean boxer shorts and places a spit shield over his head and face before submitting to hand restraints without issue. Again, no leg restraints are applied. Officers open the shower door and walk Manago out of the shower cell. The camera then conducts a closeup 360-degree assessment of Manago and no injuries can be seen. No leg restraints or lacerations are seen on Manago's legs or ankles, and no bruising, bleeding, or wounds are seen around Manago's wrists. Officers escort Manago to medical where he undergoes a post-use-of-force medical evaluation. Through the window of the medical exam room door, a nurse is seen examining Manago and making handwritten notes. Manago's medical exam lasts for more than three minutes. Officers then calmly escort Manago out of the exam room and walk him to a new cell (cell # 2102). Once in his new cell, Manago submits to the removal of his hand restraints. Smith makes closing remarks to the camera, explaining that officers gave Manago clean linens and will monitor him for the next forty-five minutes. The second video then concludes.

Defendants do not provide video evidence of Defendants Nicholson and Bryant's actions in applying restraints to secure Manago for placement on property restriction. And the record is not clear on the chronology of when Manago's placement on property restriction occurred. Defendants, however, do provide affidavits from both Defendants Nicholson and Bryant who describe

their participation in the events of September 8, 2022. See Docs. 39-4, 39-6. In

his affidavit, Defendant Bryant states:

> To the best of my recollection, on September 8, 2022,
> Captain Benjamin Smith informed me that a use of
> force had been authorized against Inmate Manago []
> in response to Manago yelling obscenities and
> exhibiting disruptive behavior from his cell.

> As such, Inmate Manago was placed on property
> restriction in order to prevent the inmate from using
> that property in a way that would pose a security risk
> during a[n] authorized use of force involving chemical
> agents.

> Sergeant Nicholson and I ordered inmate Manago to
> submit to hand and leg restraint procedure[s] in
> preparation for a strip search and removing inmate
> Manago's property.

> While I cannot recall the exact circumstances of this
> incident, when placing an inmate in restraints, I
> always place a finger between the restraint and the
> inmate's wrist to prevent any possibility of injury from
> the restraints.

> After securing restraints on inmate Manago,
> Sergeant Nicholson and I removed all personal
> property, linens, and clothing from inmate Manago's
> cell, and a modesty cloth was provided to inmate
> Manago.

> At which point, inmate Manago would have been
> placed back into his cell, and my involvement in the
> incident ceased.

> At no time did I violate any FD[O]C policy or procedure
> for handling the situation that was presented by
> [Manago]'s noncompliant, disruptive behavior.

> At no time did I witness any violation of FD[O]C policy or procedure by any of the other Defendants in this case.

Doc. 39-4 (paragraph enumeration omitted). Defendant Nicholson's affidavit is nearly identical to Bryant's affidavit. <u>See</u> Doc. 39-6.

Defendants also provide affidavits from other Defendants, as well as documents Defendants generated after the use of force. In his affidavit, Defendant Carter describes his participation in the events at issue:

> On September 8, 2022, I was the assigned Chief of Security of H-Dorm at Hamilton Correctional Institution, an administrative confinement dorm at the institution.

> To the best of my recollection, Plaintiff Manago was within the dorm, and he had beg[u]n creating a disturbance within the housing unit by yelling obscenities towards staff and ignoring commands to cease his disruptive behavior.

> Captain Smith and I requested authorization for a use of force involving chemical agents provided that Plaintiff Manago did not cease his disruptive behavior and become compliant with orders.

> Captain Smith provided Plaintiff Manago with a warning that if he did not cease his actions of yelling obscenities at staff and comply with orders, then chemical agents would be deployed against him.

> Plaintiff Manago then continued his disruptive actions by further yelling obscenities towards staff, and I witnessed officers utilize the use of force camera to film the incident.

13

I then witnessed Officer London Boone administer three (3) one (1) second bursts of Oleoresin capsicum ("OC") chemical agents which struck Plaintiff Manago in the facial and upper torso region.

While I did not utilize force or participate in the authorized use of force protocol, I witnessed other officers restrain Plaintiff Manago using hand restraints, remove him from his cell, and place him in the decontamination shower after removing the restraints while providing him with fresh linens.

Officers then replaced the hand restraints on Plaintiff Manago, and he was then taken to the medical examination room in accordance with FD[O]C post use of force protocol.

To the best of my knowledge, no injuries were noted by medical staff following the use of force.

Plaintiff Manago was then escorted from the medical examination room to a new cell while his previous cell was cleaned of chemical agents.

At no time did I violate any FD[O]C policy or procedure for handling the situation that was presented by [Manago]'s noncompliant, disruptive behavior.

At no time did I witness any violation of FD[O]C policy or procedure by any of the other Defendants in this case.

Doc. 39-5 (paragraph enumeration omitted).

In his affidavit, Defendant Smith explains that he works in a supervisory position, which directs all security activities on an assigned shift, plans workloads and objectives, inspects security measures, and evaluates

employees to ensure established criteria are met. <u>See</u> Doc. 39-7. According to

Smith:

> On September 8, 2022, I was the officer-in-charge of
> H-Dorm, an administrative confinement dorm at
> Hamilton Correctional Institution[].
>
> I was made aware by other officers within H-Dorm
> that Plaintiff Manago was creating a disturbance by
> yelling obscenities from his cell.
>
> Plaintiff Manago was given commands from several
> officers, including the housing officer on duty, to cease
> his actions and return to compliance.
>
> Plaintiff Manago directly disobeyed these commands
> and continued to create disturbances throughout the
> day.
>
> At or about 3:00 p.m. on the day of the incident, I
> received authorization from the Warden, Randall
> Polk, to proceed with an organized use of force
> involving the application of chemical agents provided
> that Plaintiff Manago continued his disruptive
> behavior following a final warning in accordance with
> the use of force policy.
>
> I then proceeded with the procedure for an organized
> use of force by having another officer video record
> myself giving Plaintiff Manago a final, verbal warning
> that if his disruptive actions continued chemical
> agents would be deployed.
>
> Additionally, Plaintiff Manago was placed on property
> restriction wherein his personal property was
> confiscated and removed from the cell in response to
> the disturbance and security risk created by the
> disturbance.
>
> I instructed Sergeants Bryant and Nicholson to place

Plaintiff Manago on property restriction where Plaintiff Manago was ordered to submit to cuffing procedures, and once he complied, his personal belongings, including clothing, aside from his boxers, were removed, in accordance with Department policy.

Around 5:00 p.m., Plaintiff Manago was observed continuing to create a disturbance in the housing unit from his cell by yelling obscenities towards correctional officers.

Following that, Officer Harper, Officer Boone, Officer Dewberry, Officer Benson and myself, went to Plaintiff Manago's cell, and Officer Boone applied three, short, approximately one (1) second bursts of chemical agents into Manago's cell.

After approximately four or five minutes, Manago was removed from his cell and submitted to hand restraints.

Manago was immediately placed into a decontamination shower, his hand restraints were removed, and he was provided with fresh linens.

After completing the decontamination shower, Manago was again placed in hand restraints, a 360-degree video of Manago was performed, and then, Manago was taken to medical for a post use of force examination.

After the medical examination, Manago was taken to a new cell in administrative confinement while his previous cell was cleaned of chemical agents, and the use of force was completed.

At no time did I violate any FD[O]C policy or procedure for handling the situation that was presented by [Manago]'s noncompliant, disruptive behavior.

At no time did I witness any violation of FD[O]C policy

16

> or procedure by any of the other Defendants in this
> case.

Doc. 39-7 (paragraph enumeration omitted). Defendants also submit a copy of

the September 8, 2022 written "Authorization for Use of Force." <u>See</u> Doc. 39-

10. In the Authorization, Warden Polk states:

> On September 8th, 2022 I was contacted by Captain
> Benjamin Smith who advised that inmate Manago . . .
> was on Wing 1 of H-Dormitory shouting obscenities
> towards staff. Captain Smith advised that all Crisis
> Intervention efforts had proven unsuccessful to bring
> inmate Manago into compliance with lawful orders. I
> authorized the use of OC Chemical Agent, if necessary,
> to be utilized should inmate Manago continue his
> disruption of the housing unit.

Doc. 39-10.

In his affidavit, Defendant Boone contends:

> On September 8, 2022, Captain Benjamin Smith
> summon[ed] me to H-Dormitory and informed that a
> use of force had been authorized against Inmate
> Manago [] in response to Manago yelling obscenities
> and exhibiting disorderly conduct from his cell.
>
> As such, I responded to the authorized use of force with
> Captain Smith, and I was advised that the use of
> chemical agents was authorized should Manago
> continue his disruptive behavior.
>
> Manago then continued his disruption of normal
> operations of the housing unit, and the use of chemical
> agents was necessitated.
>
> Upon instructions from Captain Smith, I administered
> three (3) one (1) second bursts of Oleoresin Capsicum
> ("OC") spray which struck Manago in the facial and

upper torso region of his body.

Following the deployment of chemical agents, Officer Dewberry and Sergeant Benson complied with FD[O]C policy regarding post use of force procedure, and my involvement ceased.

At no time did I violate any FD[O]C policy or procedure for handling the situation that was presented by [Manago]'s non-compliant, disruptive behavior.

At no time did I witness any violation of FD[O]C policy or procedure by any of the other Defendants in this case

Doc. 39-8 (paragraph enumerations omitted). Defendants also provide Defendant Boone's written "Report of Force Used." See Doc. 39-1 at 1-3. The Report states that Defendant Smith and RN Reiss initially counseled Manago and Smith issued his final order to Manago around 3:09 p.m., advising Manago that "[i]f disruptive behavior continues chemical agents will be administered." Id. at 1. The initial counseling results were documented as "Positive" and Manago "Compl[ied]." Id. According to the Report, at 4:45 p.m., "In[mate] Manago resumed his earlier actions by yelling obscenities towards staff and disrupting the housing unit," and so Defendant Boone administered three one-second bursts of chemical agents, "striking [] Manago in the facial and upper torso [areas]." Id. The Report adds that "[s]ubsequent to the application of chemical agents, [] Manago complied with all orders and all force ceased"; Manago did not sustain any injuries; Defendant Carter and Officer Harper

witnessed the use of force; and Defendant Dewberry monitored Manago for respiratory distress after he was returned to a clean cell. Id. at 1-2. After reviewing the Report and video evidence, Warden Polk and the Office of the Inspector General both documented that the incident appeared to comply with the rules governing the use of force. Id. at 2-3.

In his affidavit, Defendant Dewberry states:

> On September 8, 2022, Captain Benjamin Smith informed me that a use of force had been authorized against Inmate Manago [] in response to Manago yelling obscenities and exhibiting disruptive behavior from his cell.
>
> As such, I responded to the authorized use of force with Captain Smith.
>
> Following Officer Boone's deployment of chemical agents, myself and another officer placed hand restraints on Manago in order to transport Manago to the decontamination showers.
>
> While I cannot recall the exact circumstances of this incident, when placing an inmate in restraints, I always place a finger between the restraint and the inmate's wrist to prevent any possibility of injury from the restraints.
>
> After being placed in hand restraints, Manago was taken to the decontamination shower, the restraints were removed, and fresh linens were provided.
>
> After completing the decontamination shower, I again placed Manago in hand restraints, a 360 degree video of Manago was performed, and then, I escorted Manago to medical for a post use of force examination.

> After the medical examination, I escorted Manago to a
> new cell in administrative confinement while his
> previous cell was cleaned of chemical agents, and the
> use of force was completed.
>
> At no time did I violate any FD[O]C policy or procedure
> for handling the situation that was presented by
> Plaintiff's noncompliant, disruptive behavior.
>
> At no time did I witness any violation of FD[O]C policy
> or procedure by any of the other Defendants in this
> case.

Doc. 39-9 (paragraph enumeration omitted). Although Defendants state in

their Motion that Defendant Benson prepared an affidavit "in agreement with

the other Defendants' account of events," they were still awaiting the return of

Benson's affidavit when they filed the Motion. See Motion at 5 n.1. They never

submitted that evidence to the Court. Lastly, Defendants provide a "Witness

Statement" completed by Lt. Fallard, which states, "Inmate refused to make a

statement." Doc. 39-11.

### B. Manago's Responses & Evidence

In opposition to Defendants' Motion, Manago argues that there are

genuine issues of material fact that preclude summary judgment in favor of

Defendants. See Doc. 44 at 2. According to Manago, Defendants' affidavits are

"squarely contradictory" to Manago's declaration and raise a factual dispute

over whether the force used violated Manago's Eighth Amendment rights. Id.

at 3. To that end, he contends Defendants are not entitled to qualified immunity. Id. at 4-5.

Manago provides his own declaration to support his argument. See Doc. 45. In his declaration, Manago states:

> At . . . 9:00 a.m. the morning of September 8, 2022[,] [D]efendant Smith came to my cell . . . and threatened to use chemical agents against me because [D]efendants Carter and Boone wanted to punish me for unjustifiable reasons stemming from an incident related to another inmate and staff members.
>
> A few hours later [D]efendants Smith, Nicholson, and Bryant were ordered by [D]efendant Carter to place me on property restriction.
>
> After the [D]efendants Nicholson and Bryant removed me from my cell and then they placed hand and leg restraints on me and caused me to bleed because of the tightness of the restraints.
>
> Later that afternoon [around] 4:48 p.m. [D]efendants Carter and Smith ordered [D]efendant Boone to administer chemical agents into my cell without any warning nor command.
>
> After the chemical agents were deployed into my cell and upon my body[,] Defendants Benson and Dewberry removed me from my cell and reapplied hand and leg restraints which also caused more bleeding of the already open wounds that I had suffered that morning.
>
> Shortly after I was removed from the decontamination shower[,] I was placed back into my contaminated cell with clear lacerations that were untreated.

> Contrary to [D]efendants' affidavits, during those events I never created any disturbance nor did I yell any obscenities and I did not disobey any lawful commands. Rather, I sat on my bed, remaining quiet the entire time throughout each ordeal that I had with the [D]efendants.
>
> . . . .

Doc. 45 at 2-3 (paragraph enumeration omitted). Manago also provides a "Statement of Disputed Factual Issues," in which he lists seven purported genuine issues of material fact that preclude summary judgment. See Doc. 46. The list includes whether: Manago caused a disturbance on H-Dorm; officers warned Manago that chemical agents would be used if he did not cooperate; Defendants planned the attack; Defendants manipulated the video footage and reports; Defendants' use of force was applied in a good-faith effort to maintain discipline; Manago's injuries were de minimis; and Defendants denied him medical care for his injuries. See generally id.

## V. Applicable Law

### A. Eighth Amendment Excessive Force & Failure to Intervene

The Eighth Amendment "prohibits the unnecessary and wanton infliction of pain, or the infliction of pain totally without penological justification." Ort v. White, 813 F.2d 318, 321 (11th Cir. 1987). However, it is well understood that prison guards, who are charged with maintaining order and security, may use force when necessary to bring unruly inmates into

compliance. Whitley v. Albers, 475 U.S. 312, 320-21 (1986); Williams v. Burton, 943 F.2d 1572, 1575 (11th Cir. 1991).

In Sconiers v. Lockhart, 946 F.3d 1256, 1265 (11th Cir. 2020), the Eleventh Circuit reviewed "the principles applicable to Eighth Amendment excessive-force" claims:

> The Eighth Amendment, among other things, prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. As the Supreme Court has explained, "the unnecessary and wanton infliction of pain" qualifies under the Eighth Amendment as proscribed "cruel and unusual punishment." Hudson v. McMillian, 503 U.S. 1, 5 (1992). Nevertheless, the Supreme Court has instructed that what rises to the level of an "unnecessary and wanton infliction of pain" differs based on the type of Eighth Amendment violation alleged. Id.

> . . . "[T]he core judicial inquiry" requires [the Court] to consider "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Wilkins, 559 U.S. at 37.[8] This standard requires a prisoner to establish two elements – one subjective and one objective: the official must have both "acted with a sufficiently culpable state of mind" (the subjective element), and the conduct must have been "objectively harmful enough to establish a constitutional violation." Hudson, 503 U.S. at 8.

> With respect to the subjective element, "to have a valid claim . . . the excessive force must have been sadistically and maliciously applied for the very purpose of causing harm." Johnson v. Breeden, 280

---

[8] Wilkins v. Gaddy, 559 U.S. 34 (2010) (per curiam).

F.3d 1308, 1321 (11th Cir. 2002); see also Thomas v. Bryant, 614 F.3d 1288, 1304 (11th Cir. 2010).

As for the objective component of an excessive-force violation, it focuses on whether the official's actions were "harmful enough," Hudson, 503 U.S. at 8, or "sufficiently serious," Wilson v. Seiter, 501 U.S. 294, 298 (1991), to violate the Constitution. "Not every malevolent touch by a prison guard gives rise to a federal cause of action." Wilkins, 559 U.S. at 37. "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." Id. at 37–38. Instead, the Eighth Amendment prohibits force that offends "contemporary standards of decency," regardless of whether "significant injury is evident," though the extent of injury may shed light on the amount of force applied or "whether the use of force could plausibly have been thought necessary." Wilkins, 559 U.S. at 37.

Id. at 1265–66 (internal citations cleaned up).

Courts consider five distinct factors when determining whether an officer applied force maliciously and sadistically for the purpose of causing harm:

(1) the extent of injury; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them.

Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir. 1999) (quoting Whitley, 475 U.S. at 321; Hudson, 503 U.S. at 7). Notably, a lack of serious injury, while not dispositive, is relevant to the inquiry:

> "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." Ibid.[9] (quoting Whitley, supra, at 321, 106 S. Ct. 1078). The extent of injury may also provide some indication of the amount of force applied. . . . An inmate who complains of a "'push or shove'" that causes no discernible injury almost certainly fails to state a valid excessive force claim. Id. at 9 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).[10]
>
> Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury.

Wilkins, 559 U.S. at 37-38. Nevertheless, a prisoner's injuries or lack thereof may be "evidence of the kind or degree of force that was used by [an] officer." Charles v. Johnson, 18 F.4th 686, 700 (11th Cir. 2021) (citing Crocker v. Beatty, 995 F.3d 1232, 1251 (11th Cir. 2021)).

---

[9] Hudson, 503 U.S. at 7.

[10] See Johnson, 481 F.2d at 1033 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.").

In considering the <u>Whitley</u> factors, courts must "give a 'wide range of deference to prison officials acting to preserve discipline and security,' including when considering '[d]ecisions made at the scene of a disturbance.'" <u>Cockrell v. Sparks</u>, 510 F.3d 1307, 1311 (11th Cir. 2007) (quoting <u>Bennett v. Parker</u>, 898 F.2d 1530, 1533 (11th Cir. 1990)). Moreover, corrections officials are not required to "convince every inmate that their orders are reasonable and well-thought out," and "[c]ertainly . . . are not required to do so where an inmate repeatedly fails to follow those orders." <u>Danley</u>, 540 F.3d at 1307. As such, "courts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives." <u>Whitley</u>, 475 U.S. at 322. A case should not go to the jury "[u]nless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain." <u>Id.</u> Notably, the Eleventh Circuit has also stated "that where chemical agents are used unnecessarily, without penological justification, or for the very purpose of punishment or harm, that use satisfies the Eighth Amendment's objective harm requirement." <u>Thomas v. Bryant</u>, 614 F.3d 1288, 1311 (11th Cir.2010) (citations omitted).

With respect to Manago's duty to intervene claim, the law is well-established that a corrections officer has a duty to intervene when he witnesses a fellow officer's use of excessive force against an inmate and is in a position to

intervene. See Helm v. Rainbow City, Ala., 989 F.3d 1265, 1272 (11th Cir. 2021) (citing Priester v. City of Riviera Beach, 208 F.3d 919, 924-27 (11th Cir. 2000)). "Of course, there also must be an underlying constitutional violation. Plainly, an officer cannot be liable for failing to stop or intervene when there was no constitutional violation being committed." Sebastian v. Ortiz, 918 F.3d 1301, 1312 (11th Cir. 2019) (citations omitted). Nevertheless, a failure-to-intervene claim is "wholly dependent on the underlying excessive force claim." Id.

## B. Qualified Immunity

"Qualified immunity protects from civil liability government officials who perform discretionary functions if the conduct of the officials does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). As a result, the qualified immunity defense protects from suit "'all but the plainly incompetent or those who knowingly violate the law.'" Carr v. Tatangelo, 338 F.3d 1259, 1266 (11th Cir. 2003) (citation omitted). Indeed, as "'government officials are not required to err on the side of caution,' qualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were lawful." Lee v. Ferraro, 284 F.3d 1188, 1200 (11th Cir. 2002) (quoting Marsh v. Butler Cnty., Ala., 268 F.3d 1014, 1031 n.8 (11th Cir. 2001)).

27

To be entitled to qualified immunity, an official bears the initial burden of establishing that his conduct fell within his discretionary authority. See Webster v. Beary, 228 F. App'x 844, 848 (11th Cir. 2007). If the defendant does so, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate using the two-prong test established by the Supreme Court in Saucier v. Katz, 533 U.S. 194, 201 (2001). In accordance with Saucier, the Court must ask whether the facts viewed in the light most favorable to the plaintiff "show the officer's conduct violated a constitutional right." Id.; see also Hope v. Pelzer, 536 U.S. 730, 736 (2002); Beshers v. Harrison, 495 F.3d 1260, 1265 (11th Cir. 2007) (quoting Scott v. Harris, 550 U.S. 372, 377 (2007)). The court must also ask whether the right allegedly violated was clearly established at the time of the violation. Hope, 536 U.S. at 739; Saucier, 533 U.S. at 201; Scott, 550 U.S. at 377; Underwood v. City of Bessemer, 11 F.4th 1317, 1328 (11th Cir. 2021) ("[W]e ask two questions: (1) whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right, and (2) if so, whether the right at issue was clearly established at the time of the defendant's alleged misconduct.") (internal quotations omitted). The Court may consider these questions in whichever order it chooses, and qualified immunity will protect the defendant if the answer to either question is "no." Pearson v. Callahan, 555 U.S. 223, 232, 236 (2009); Underwood, 11 F.4th at 1328.

Also, "[b]ecause § 1983 'requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation,' each defendant is typically entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions." Alcocer v. Mills, 906 F.3d 944, 951 (11th Cir. 2018) (quoting Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986)).

## VI. Analysis

### A. Use of Chemical Agents & Failure to Intervene

Manago asserts that Defendant Boone's use of chemical agents, upon Defendant Smith's order, amounted to excessive force. AC at 8. He also contends that Defendants Carter, Benson, and Dewberry failed to intervene in the use of excessive force. Id. at 8. Defendants argue that "[g]iven [Manago's] disruptive behavior, [] Defendants['] strict adherence to section 33-603.210(2)(a)(5), F.A.C., the justified use of force that was completely captured on irrefutable video, and the fact that no injuries occurred, Defendants are entitled to qualified immunity." Motion at 5.

Here, the Court is faced with two different versions of events. Defendants provide a Report and affidavits that chemical agents were necessary because after receiving Defendant Smith's final order, Manago resumed his disruptive actions and continued to yell obscenities towards correctional staff. See Docs. 39-1, 39-5, 39-7, 39-8. Manago, on the other hand, swears he never created a

29

disturbance, yelled obscenities, or disobeyed any lawful commands. Doc. 45 at 3. Instead, according to Manago, throughout these events, he sat on his bed and remained quiet. Id. Moreover, Manago swears that earlier that day, Smith had "threatened to use chemical agents against me because [D]efendants Carter and Boone wanted to punish me for unjustifiable reasons stemming from an incident related to another inmate and staff members." Doc. 45 at 2-3.

Contrary to Defendants' assertion, the video evidence does not "completely capture[] [] irrefutable" conduct justifying their application of chemical agents. Indeed, the videos do not actually show Manago causing a disturbance either before Defendant Smith issued his final order or before the application of chemical agents. And the videos do not conclusively refute Manago's contention that he, at all times, complied with all commands. Instead, throughout the first video recording, Manago is seen obeying Defendant Smith's final order, which bolsters Manago's position that he followed all lawful instructions.

The second video recording begins with Defendant Smith's lead-in statement that Manago has resumed his disruptive behavior. Defendant Smith and Defendant Boone then walk towards Manago's cell to administer the chemical agents. But when Smith and Boone open the door to enter the housing wing, no yelling can be heard, and no obscenities are being screamed from the direction of Manago's cell. Indeed, the video does not even show Manago

through his cell door window. Nevertheless, despite the lack of visual or audible disruptive behavior coming from Manago's cell, and without first communicating with Manago in any way, Defendant Smith opens Manago's cell door and Defendant Boone sprays three bursts of chemical agents inside. The video does not show where Manago is located when the chemical agents are administered or if any of the sprays directly hit Manago. Notably, Manago is not seen on the second video recording until after the application of chemical agents when he occasionally, and calmly, approaches his cell door window. And, despite the clear similarities between the video recording of Manago's conduct before the use of chemical agents and his conduct after the use of chemical agents, Defendants maintain that only after using chemical agents, Manago finally ceased his disruptive behavior.

In light of this equivocal video evidence, the Court is left with the parties' competing version of events. As such, there remain genuine issues of material fact as to whether Manago's behavior warranted the use of chemical agents. See Sears v. Roberts, 922 F.3d 1199, 1208 (11th Cir. 2019) (citation omitted) ("[A] plaintiff's testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law, meaning that it relates to facts that could not have possibly been observed or events that are contrary to the laws of nature."). It is not the province of the Court on summary judgment to weigh the evidence or make

credibility determinations. See Sconiers, 946 F.3d at 1263 ("Summary judgment is not a time for fact-finding; that task is reserved for trial."); Sears, 922 F.3d at 1208-09; see also Rivera v. LeBron, 824 F. App'x 838, 842 (11th Cir. 2020) ("As a general rule, that kind of credibility determination is not appropriate at the summary judgment stage."). Moreover, while Defendants argue that Manago only suffered de minimis injuries, de minimis injuries alone do not overcome the parties' competing evidence regarding Defendants' justification, or lack thereof, for the use of chemical agents. See, e.g., Stallworth v. Tyson, 578 F. App'x 948, 954 (11th Cir. 2014) ("[E]ven if [the plaintiff's] alleged injuries were not serious, this would not necessarily preclude a claim of cruel and unusual punishment because viewing the evidence in the light most favorable to [the plaintiff], [the defendant's] use of pepper spray . . . would be repugnant to the conscience of mankind[.]") (internal quote omitted). Also, an excessive force violation under the Eighth Amendment has long been a clearly established right. See Skrtich v. Thornton, 280 F.3d 1295, 1301 (11th Cir. 2002) ("In this Circuit, a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force 'maliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution."), overruled on other grounds by Pearson, 555 U.S. 223. Thus, the Court concludes Defendants Smith and Boone are not entitled to qualified immunity and denies

Defendants' Motion to the extent that they seek summary judgment on Manago's claim that the use of chemical agents amounted to excessive force.

To the extent Defendants rely on the video evidence to argue that there was no reason for anyone present to intervene in the use of chemical agents, this position is without merit. As stated, the video does not show that Manago's behavior warranted the use of chemical agents, and Defendants who were allegedly present for the use of force (Defendants Carter, Benson, and Dewberry)[11] likely had a better view of what occurred prior to and during the use of chemical agents than that which can be seen on the video. But in light of the parties' competing versions of events, and viewing the facts in the light most favorable to Manago, as the Court must, there remain genuine issues of material fact as to whether Defendants Carter, Benson, and Dewberry failed to intervene in Defendants Smith and Boone's use of chemical agents. Controlling authority provides that failing to intervene in the use of excessive force violates a clearly established constitutional right. See Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 927-28 (11th Cir. 2000) ("That a police officer had a duty to intervene when he witnessed the use of excessive force and had the ability to intervene was clearly established in February 1994."). As such, the Court finds Defendants Carter, Benson, and Dewberry are not entitled to

---

[11] Indeed, Manago asserts Carter and Boone wanted to punish him for "unjustifiable reasons." Doc. 45 at 2-3.

qualified immunity. The Court denies Defendants' Motion to the extent that they seek summary judgment on Manago's failure to intervene claims.

## B. Application of Leg & Hand Restraints

Manago contends that Defendants Nicholson and Bryant used excessive force in applying Manago's wrist and leg restraints when placing him on property restriction. AC at 7. He also asserts that after the use of chemical agents, Defendants Dewberry and Benson used excessive force in applying Manago's hand and leg restraints, which exacerbated the injuries to his wrists and ankles and caused additional lacerations and bleeding. Id. at 8. Defendants argue they are entitled to qualified immunity on these claims because Defendants Nicholson, Bryant, Dewberry, and Benson were "performing the discretionary functions of placing restraint cuffs" on Manago; and "no injuries were noted in the Report of Force Used, no such injuries are seen on the video of [Manago], and [Manago] makes no complaints of such injuries during the video." Motion at 9-11.

### Defendants Nicholson & Bryant

The Court first addresses Manago's claims against Defendants Nicholson and Bryant. According to Manago, Defendants Carter and Boone wanted to punish him for "unjustifiable reasons." Doc. 45 at 2. And upon Defendant Carter's order, when placing Manago on property restriction, Defendants Nicholson and Bryant "placed hand and leg restraints on [Manago]

and caused [him] to bleed because of the tightness of the restraints." Doc. 45 at 2. In their nearly identical affidavits, Defendants Nicholson and Bryant state that while they cannot recall the exact circumstances of this incident, they "always place a finger between the restraint and the inmate's wrist to prevent" injury. <u>See</u> Docs. 39-4, 39-6.

Again, as mentioned, the video evidence does not wholly contradict Manago's account because it does not show Nicholson and Bryant's application of restraints to place Manago on property restriction. However, the Court finds that the lack of video evidence here is not dispositive of this issue. Indeed, Manago seemingly attempts to demonstrate that Nicholson and Bryant applied overly tight restraints because Defendant Carter made an earlier threat to punish Manago for "unjustifiable reasons." But those allegations are vague, conclusory, and too attenuated to establish that Nicholson and Bryant acted maliciously and sadistically to cause harm. And, likely of more import, the video evidence conclusively refutes Manago's allegations that Defendants Nicholson and Bryant's application of restraints caused lacerations and bleeding to his wrists and ankles. Notably, despite Manago's assertion that the second application of restraints exacerbated the injuries caused by Defendants Nicholson and Bryant, the second video recording does not show <u>any</u> lacerations or bleeding on Manago's wrists or ankles. Likewise, Manago never alleges he advised Defendants Nicholson and Bryant that the restraints were

too tight or that they were either subjectively or objectively aware of the injuries they were inflicting and refused to cease their conduct.

Thus, viewing all the evidence in the light most favorable to Manago, the Court finds no question of material fact exists as to whether Defendants Nicholson and Bryant used excessive force in applying restraints. Rather, the record establishes Defendants Nicholson and Bryant temporarily applied restraints to remove Manago's personal property from his cell and then removed the restraints once he was placed back into his cell. Manago does not argue Defendants Nicholson and Bryant were not justified in placing him in restraints for this purpose, and his allegations about his injuries are refuted by the evidence. See Huebner v. Bradshaw, 935 F.3d 1183, 1191 (11th Cir. 2019) (recognizing, in the context of excessive force during an arrest, that the Eleventh Circuit has "repeatedly held that painful handcuffing alone doesn't constitute excessive force"); Gold v. City of Miami, 121 F.3d 1442, 1446-47 (11th Cir. 1997) (holding that use of tight handcuffs that caused pain and skin abrasions constituted minimal force for which the plaintiff could not recover under § 1983). As such, because the facts as shown do not constitute an Eighth Amendment violation, Defendants Nicholson and Bryant are entitled to summary judgment on Manago's excessive force claim regarding their

application of restraints, and Defendants' Motion is due to be granted on this issue.[12]

<u>Defendants Dewberry & Benson</u>

Next, the Court addresses Manago's claim that Defendants Dewberry and Benson's application of restraints following the use of chemical agents amounted to excessive force. In his declaration, Manago asserts that after the application of chemical agents, "Defendants Benson and Dewberry removed [him] from [his] cell and reapplied hand and leg restraints which also caused more bleeding of the already open wounds that [he] suffered that morning." Doc. 45 at 3. But the video evidence wholly contradicts Manago's allegations. Specifically, the second video recording shows that: <u>no</u> officer placed any form of leg restraint on Manago at any time between the application of chemical agents and Manago's placement in a new cell following his post-use-of-force medical exam; Manago never advised either Defendants Benson or Dewberry, or anyone else, that his wrist restraints were too tight; and no visible lacerations, bleeding, or other injuries were seen on Manago's wrists or ankles following the application of restraints.

---

[12] To the extent that Manago attempts to raise an excessive force claim against Defendant Carter because he allegedly directed Defendants Nicholson and Bryant's use of force, that claim also fails since the record shows Defendants Nicholson and Bryant did not use excessive force.

On this record, construing all facts in the light most favorable to Manago, no question of material fact exists as to whether Defendants Benson and Dewberry applied the restraints maliciously and sadistically to cause harm. Likewise, assuming their application of restraints resulted in pain and injuries, nothing in the video evidence supports even an inference that those injuries amounted to the type of lacerations and bleeding which Manago describes. See Huebner, 935 F.3d at 1191; Gold, 121 F.3d at 1446-47. As such, because the facts as shown do not constitute an Eighth Amendment violation, Defendants Benson and Dewberry are entitled to summary judgment on Manago's excessive force claim regarding their application of restraints, and Defendants' Motion is due to be granted on this issue.

## C. Manipulated Video Evidence

Manago alleges Defendants "manipulated" the handheld use-of-force camera to falsely justify their use of chemical agents. AC at 8. But, as explained above, Court finds that the video evidence does not contradict Manago's excessive force claim related to the use of chemical agents. Regardless, this is not a proper basis for a Fourteenth Amendment due process claim. Defendants' Motion is granted as to any Fourteenth Amendment claim related to the manipulation of video evidence.

Accordingly, it is

**ORDERED:**

1.    The **Clerk** is directed to correct the docket to reflect the correct spelling for Defendants "Nicholson" and "Dewberry."

2.    Defendants' Motion for Summary Judgment (Doc. 39) is **GRANTED** as to Manago's excessive force (use of restraints) claims against Defendants Nicholson, Bryant, Carter, Benson, and Dewberry and Manago's Fourteenth Amendment (manipulated video footage) claim against all Defendants. Defendants' Motion for Summary Judgment (Doc. 39) is **DENIED** in all other respects.

3.    The Clerk shall terminate Defendants Nicholson and Bryant as Defendants in this case. The Court will withhold entry of judgment until the case concludes. See Fed. R. Civ. P. 54.

4.    By **September 29, 2025**, the remaining parties shall confer in good faith in an attempt to resolve the remaining claims. If the parties reach a settlement, they shall promptly notify the Court. If the parties cannot settle the claims privately, Defendants shall file a notice advising whether the parties believe a settlement conference with a United States Magistrate Judge will be beneficial.

**DONE AND ORDERED** at Jacksonville, Florida, this 26th day of August, 2025.

**MARCIA MORALES HOWARD**
United States District Judge

Jax-7
C:    Herbert Leon Manago, #V25844
        counsel of record